IN THE DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FIFTH DISTRICT

NOT FINAL UNTIL TIME EXPIRES TO
FILE MOTION FOR REHEARING AND
DISPOSITION THEREOF IF FILED


C.F., FATHER OF B.A.F. and
C.B.F., CHILDREN,

       Appellant,

 v.

DEPARTMENT OF CHILDREN
AND FAMILIES,

       Appellee.

_____/

Case No.  5D23-1577
LT Case No. 2021-DP-000008

Opinion filed July 27, 2023

Appeal from the Circuit Court
for Marion County,
Stacy N. Youmans, Judge.

Carl S. New, Ocala, for Appellant.

Rachel Batten, Children's Legal Services,
Department of Children and Families,
Brooksville, for Appellee.

Sara Elizabeth Goldfarb, Statewide
Director of Appeals, Laura J. Lee, Assistant
Director of Appeals, and Amanda Victoria
Glass, Senior Attorney, of Guardian ad
Litem, Tallahassee, and Jamie Billotte
Moses, Orlando, for Guardian ad Litem.

KILBANE, J.

C.F. ("the Father") appeals a final judgment of termination of parental rights and permanent commitment for purposes of adoption ("the Final Judgment").[1] On appeal, he argues that the Department of Children and Families ("the Department") failed to prove by clear and convincing evidence that continuing the parental relationship would be harmful to his children pursuant to section 39.806(1)(d)3., Florida Statutes (2021). We agree and reverse.

## Facts

In 2020, the Father became incarcerated after entering a nolo contendere plea to aggravated assault with a deadly weapon and possession of a firearm by a convicted felon. He has previously served multiple prison terms for various violent and drug related felonies. He will remain incarcerated until October 2023.

In January 2021, the Father's children, B.A.F. and C.B.F., were sheltered from their mother. The trial court issued a shelter order and subsequently adjudicated the children dependent. The Department filed two case plans. Both case plans identified the goal of adoption for the children.

---

[1] The Final Judgment also terminated the mother's parental rights. She is not a party to this appeal.

2

In March 2022, the Department filed an amended verified petition for termination of parental rights. As grounds for termination, the Department alleged that the Father failed to comply with the case plan although able to do so under section 39.806(1)(e), Florida Statutes; engaged in a course of conduct that demonstrated the children's continued involvement in the parent-child relationship threatened their wellbeing under section 39.806(1)(c), Florida Statutes; and that continuing the parental relationship with the incarcerated father would be harmful to the children under section 39.806(1)(d)3., Florida Statutes.

At the trial, it was established that the Father has been continuously incarcerated since the children were eleven months old. Since then, the children have been diagnosed with significant medical conditions including developmental delays. The children's current custodian testified regarding her commendable efforts in meeting their medical needs. She further testified that she would like to pursue adoption.

The Department presented the testimonies of three family care managers. None of the family care managers had any contact with the Father while he was in prison. They did not provide him with a copy of the case plan or any documentation related to the children. They did not provide him with the Department's phone number or address. They also did not

provide him with the address for the children's care givers for him to send them letters and did not attempt to set up any sort of video or telephonic visitation. One family care manager testified that he tried to send the Father a letter on one occasion. However, it was returned to sender, and he did not try again. The only contact that the Father had with the Department while incarcerated came when someone from the Department asked him to sign a medical consent for treatment form, which he signed.

The guardian ad litem testified that she did not provide the Father with the address or phone number for the guardian ad litem's office, and she did not otherwise have any contact with him. Regarding the children, the guardian ad litem testified that they are in a "loving bonded relationship" in their current placement and that their custodian "has a strong support system with other family members and friends." She testified that it was desirable for the children to maintain their current placement and agreed with the petition's recommendation to terminate the parents' rights.

The Father testified that prior to his incarceration he had a case with the Department where he was offered voluntary services and that he completed this services plan. No other evidence regarding the voluntary services plan was presented. Upon his incarceration, he had practically no contact with the Department, and he was not offered services. Nonetheless,

4

and on his own accord, he completed a six-month substance abuse class and a two-and-a-half-month parenting class. Moreover, he has spent the last seventeen months working toward completing his general educational development ("GED"). He also presented unrebutted testimony that he has a stable housing situation and full-time employment ready and waiting for him upon release. He further testified that he attempted to call the children's custodian on multiple occasions on a prepaid line, but she never answered the phone. The custodian confirmed that the Father called at least five times, but she did not answer.

In its Final Judgment, the trial court found that the Department failed to prove that the Father did not comply with the case plan under section 39.806(1)(e) or that he "engaged in a course of conduct toward the children that demonstrated their continuing involvement in the parent-child relationship threatened the wellbeing of the children irrespective of the provision of services" under section 39.806(1)(c).

However, the court found clear and convincing evidence to support termination under section 39.806(1)(d)3. due to the Father's incarceration. The court found that the Father had no relationship with his children and that he failed to provide for their needs since removal. On the other hand, the court acknowledged that the Father signed the medical consent form and

5

was otherwise "severely limited" in his ability to provide for the children while incarcerated.

The trial court emphasized the Father's criminal history and found that his current incarceration has made him unavailable to parent. The court also considered other factors including that the Father had "not demonstrated knowledge of the children's medical conditions or needs nor an ability to adequately care for them if the children are placed in his care." Although the court considered evidence presented that the Father was "amenable to rehabilitation through his engagement in some programs while incarcerated," the court discounted this evidence based on "compelling evidence" of the Father's criminal conduct and "strong likelihood for recidivism." Finally, the court found that reunification "would harm the children, destabilizing their environment and severing strong emotional attachments."

Accordingly, the trial court terminated the Father's parental rights pursuant to section 39.806(1)(d)3., Florida Statutes. This appeal followed.

## Analysis

"Termination of parental rights cases are necessarily centered on the fundamental liberty interest in being a parent to a child." *S.M. v. Dep't of Child. & Fams.*, 202 So. 3d 769, 777 (Fla. 2016) (citing *Santosky v. Kramer*, 455 U.S. 745, 753, 787 (1982); *Padgett v. Dep't of HRS*, 577 So. 2d 565,

6

570 (Fla. 1991)). For a court to justify terminating parental rights, "the State has the burden to show by clear and convincing evidence that reunification with the parent poses 'a substantial risk of significant harm' to the child, such as abuse, neglect or abandonment." *In re J.B.*, 923 So. 2d 1201, 1205 (Fla. 2d DCA 2006) (citing *Padgett*, 577 So. 2d at 571). However, a "parent's efforts, or lack thereof, to assume parental duties while incarcerated must be considered in light of the limited opportunities to assume those duties while in prison." *C.P. v. Dep't of Child. & Fams.*, 323 So. 3d 204, 207 (Fla. 4th DCA 2021). "Where a trial court has found that there is clear and convincing evidence supporting a termination of parental rights, such findings enjoy a presumption of correctness and will not be overturned unless clearly erroneous and lacking evidentiary support." *L.F. v. Dep't of Child. & Fams.*, 888 So. 2d 147, 148 (Fla. 5th DCA 2004) (citing *C.C. v. Dep't of Child. & Fams.*, 886 So. 2d 244 (Fla. 5th DCA 2004)).

Section 39.806(1)(d)3. states that termination of parental rights may be established when a parent of a child is incarcerated and:

> The court determines by clear and convincing evidence that continuing the parental relationship with the incarcerated parent would be harmful to the child and, for this reason, that termination of the parental rights of the incarcerated parent is in the best interest of the child. When determining harm, the court shall consider the following factors:

a. The age of the child.

b. The relationship between the child and the parent.

c. The nature of the parent's current and past provision for the child's developmental, cognitive, psychological, and physical needs.

d. The parent's history of criminal behavior, which may include the frequency of incarceration and the unavailability of the parent to the child due to incarceration.

e. Any other factor the court deems relevant.

§ 39.806(1)(d)3., Fla. Stat. (2021). "[T]he statute does not require proof that actual contact is detrimental." *R.M. v. Dep't of Child. & Fams*., 847 So. 2d 1103, 1104 (Fla. 4th DCA 2003). However, "a trial court is precluded from terminating parental rights on the statutory ground that continuing the parental relationship with the incarcerated parent would be harmful to the child under section 39.806(1)(d)(3) where no evidence regarding the impact of continuing the parent-child relationship is offered." *In re N.S.*, 898 So. 2d 1194, 1198 (Fla. 2d DCA 2005); *accord In re J.B.*, 923 So. 2d at 1207.

Here, the Department offered no evidence regarding the impact of continuing the parent-child relationship. Despite the trial court's assertion that the Department presented "compelling evidence" of the Father's criminal conduct, no witness testified regarding the Father's likelihood for recidivism. *See S.S. v. D.L.*, 944 So. 2d 553, 559 (Fla. 4th DCA 2007) (stating that "[t]he

8

issue in prospective neglect or abuse cases is whether future behavior . . . can be clearly and certainly predicted" and that "speculation is not a sufficient basis for terminating parent rights").  The only evidence presented relevant to the Father's likelihood for recidivism came from the Father.  His unrebutted testimony established that he completed a substance abuse class, completed a parenting class, is working on his GED, and has full-time employment with stable housing set up for when he is released.  *See W.R. v. Dep't of Child. & Fam. Servs.*, 896 So. 2d 911, 915 (Fla. 4th DCA 2005) ("While a parent's past conduct necessarily has some predicative value as to that parent's likely future conduct, positive life changes can overcome a negative history for purposes of termination of a parental rights analysis.").

The trial court also considered the fact that the Father did not demonstrate knowledge of the children's medical conditions or an ability to care for them.  However, the children had no diagnosed medical issues prior to the Father's incarceration.  Once incarcerated, the Department did not communicate with the Father, beyond having him sign a medical consent form.  The Department did not send him any documentation or provide him with a copy of the case plan.  Furthermore, the Department did not set up any opportunities for the Father to speak with his children or their care givers.  Without any assistance from the Department, the Father still attempted to

reach out to the children's custodian on multiple occasions, but she never answered the phone. *See C.P.*, 323 So. 3d at 207 (stating that a parent's efforts must be considered in light of the limited opportunities in prison). Moreover, the Father's unrebutted testimony established that he will have full-time employment and stable housing upon his release, which demonstrates an ability to adequately care for the children.[2]

Finally, the trial court found that reunification with the Father "would harm the children, destabilizing their environment and severing strong emotional attachments." Although the Department presented testimony that the children had bonded with their custodian and her family, no witness testified that the children would suffer any harm if reunified with the Father. In fact, no witness was asked this question, and therefore, no such evidence was presented. *See In re J.B.*, 923 So. 2d at 1204, 1207 (finding that there was no evidence presented that the father's incarceration would adversely impact the child where testimony only established that the child was doing well in his current placement and had bonded with his foster family who sought to adopt him); *cf. R.M.*, 847 So. 2d 1103 (finding clear and convincing

---

[2] We find it necessary to note that the Department did not inquire regarding what type of employment the Father had set up or what his living situation would look like. Based on the record before us, we are unable to find evidentiary support to dispute the Father's claims.

10

evidence to terminate parental rights under section 39.806(1)(d)3., where the children's therapists testified regarding the children's mental state, their need for permanency, and "stressed that the possibility of the father reclaiming his children after his incarceration would be extremely detrimental to the children's mental health").[3]

### Conclusion

Because the Department failed to present any evidence that continuing the parental relationship would be harmful to the children, the trial court was precluded from terminating parental rights pursuant to section 39.806(1)(d)3., Florida Statutes. *See In re N.S.*, 898 So. 2d at 1198; *In re J.B.*, 923 So. 2d at 1207.[4] Accordingly, the trial court's Final Judgment is

---

[3] The Department relies on *Department of Children & Families v. J.S.*, 183 So. 3d 1177 (Fla. 4th DCA 2016). However, its reliance on *J.S.* is misplaced. In *J.S.*, the case manager testified based on her training and experience that "she did not believe the child would be safe if the court returned the child to the father's care." *Id* at 1180. Here, the Department presented no such testimony.

[4] Because the Department failed to prove a statutory basis to terminate parental rights, we do not address whether termination was the least restrictive means of protecting the children from harm or if it was in their manifest best interest. *See S.M.*, 202 So. 3d at 775–77 (explaining that termination of parental rights is a "multi-step process set forth in the statutory scheme and case law of this State" and that only after the trial court finds clear and convincing evidence to support a statutory ground for termination does the court consider the manifest best interest of the child and make a determination "that termination is the least restrictive means of protecting the child from harm"); *In re J.B.,* 923 So. 2d at 1208 (finding it unnecessary to

reversed and remanded for further proceedings, to include a new adjudicatory hearing.

REVERSED and REMANDED.

HARRIS and PRATT, JJ., concur.

---

discuss whether termination of parental rights was in the manifest best interest of the child where the statutory ground for termination was not supported by clear and convincing evidence).